**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JULIE GALLAGHER,** | ) | **Case No. 1:06 CV 2443** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **C.H. ROBINSON WORLDWIDE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Before the Court is Defendant's Motion for Summary Judgment ("Motion") (**ECF No. 25**). Plaintiff Julie Gallagher has sued her former employer, Defendant C.H. Robinson Worldwide, Inc. ("CHR"), for creating a sexually hostile work environment under both state and federal law, and for gender discrimination. For the following reasons, the Court **GRANTS** the Motion and enters judgment in favor of CHR.

**I.**

In August 2002, Plaintiff Julie Gallagher, who had worked for two years as a sales representative for a transportation logistics company in Michigan called Con-Way Truckload Services ("Con-Way"), was looking for a similar position in Cleveland, Ohio. *See generally ECF No. 34* ("Gallagher Dep.") at 65 - 71. She initially looked into transferring into another position within Con-Way in Cleveland, but no such position was available. *Id*. She was

told, however, that Con-Way was going to create an outside sales force within the next five years. *Id*. Meanwhile, Gallagher discovered that there was a sales opening at another transportation logistics company in Cleveland, Defendant CHR, thought it was a good fit and commenced employment there on September 3, 2002. *Id.*

At that time, the Cleveland office of CHR employed approximately 20 sales employees and 3 support personnel. Sales employees' job duties included booking freight loads, ensuring the timely and safe arrival of loads and negotiating rates. In order to carry out those duties, the sales staff worked in cubicles (work stations) that were organized in pods in an open floor plan. Short dividers separated them so they could freely communicate with one another while conducting business. The sales staff used telephones and computers and facilitate their transactions, and had access to the Internet to conduct their business. The short divider walls between cubicles provided little privacy; co-workers' computers were fairly visible to each other, conversations between employees as well phone conversations with customers were readily overheard. The environment at the Company was noisy, the job was high pressured and fast paced.

It is into this environment that Gallagher entered in September 2002. Gallagher began her employment as a transportation sales representative on a dubious note. She was interviewed by, among other potential co-workers and the branch manager, another transportation sales representative named Bryan Starosto who made it clear that he did not want to interview her. Despite this unpleasant interview, however, CHR offered her a sales position and she accepted it. She maintained this position until four months later, when she left CHR to become part of Con-Way's newly created outside sales force in Cleveland at a higher salary.

Gallagher describes the atmosphere at the Cleveland office of CHR during her four-month tenure as being much like "a guys' locker room" characterized by unprofessional behavior on the part of both males and females, and an environment that was hostile to women. *Gallagher Dep*. at 38. She testified to the prevalent use of foul language by mostly male co-workers who openly and loudly referred to female customers, truck drivers, co-workers and others as bitches, whores, sluts, dykes and cunts. *Id.* at 45, 88, 93, 210, 214-15. She testified that male and female co-workers viewed sexually explicit pictures on their computers (although the only incident she could specifically recall was a sexually explicit picture on co-worker Angela Sarris' computer during the Christmas holidays),[1] and that male co-workers left pornographic magazines lying open on their desks. *Id.* at 97-98, 116-18, 220-21. Gallagher testified that, on several occasions, Starosto brought in nude pictures of his girlfriend in different sexual poses and shared those pictures with several of his male co-workers who occasionally brought in, and shared, pictures of their own with him. *Id*. at 19, 23-25. She testified that her male co-workers traded sexual jokes and engaged in graphic discussions about their sexual liaisons, fantasies and preferences in her presence on a daily basis. *Id*. at 22-25, 44, 56, 203-205. Gallagher also testified that some of the employees drank beer in the office in the afternoon on Fridays, *Gallagher Dep*. at 146-47, that some male co-workers came in to the office on Saturdays (when branch manager Greg Quast was not there) without a shirt on, *id*. at 22-23, that

[1]Although Gallagher claims that co-workers regularly viewed pornographic pictures on their computers, discovery actually revealed that there were relatively few attempts by employees to contact pornographic websites during Gallagher's short tenure in the Cleveland office. *See Motion, Aff. of Brent Potvin* ¶¶ 3-7 (detailing CHR's efforts to block access to sexually explicit websites beginning in 2001). Discovery also revealed that there were only five sexually offensive e-mails exchanged during Gallagher's tenure. One was sent by Liehr to someone outside CHR, the others were sent by female employees.

one woman planned her entire wedding at the office, *id*. at 120, and that another planned her baby shower at the office, *id*. at 121.

When Gallagher was asked at deposition to testify to instances of sexually offensive conduct directed at her, she testified that Starosto called her a "bitch" in anger on several occasions, usually in response to her request to male co-workers to keep their sex jokes to a minimum or to put away their pornography. *Gallagher Dep*. at 210-12. Gallagher also testified that, on one occasion, several male co-workers near her desk joked that "by hiring [Gallagher, CHR] covered two quotas; the girl quota and the fat quota." *Id*. at 112. Gallagher alleges that Starosto made several derogatory comments about her weight, *id*. at 213, and Liehr once referred to Gallagher as a "heifer" with "milking udders," and "moo"ed when she walked by his desk., *id*. at 101-02. Gallagher testified that on one Saturday when she was scheduled to work, three male co-workers came into the office following a session at a gym in the building next door. *See Gallagher Dep.* at 19-24. Co-worker David Derryberry, who was wearing only a towel and announced that he was "commando" (meaning that he was wearing no underwear) sat on Starosto's desk, displaying his whole thigh, and talked with the others about anal sex, their enjoyment of it and how Starosto's girlfriend objected to it. *Id*. On the next business day, Gallagher complained to Quast about this incident and told him she did not want to work on Saturdays anymore. *Id*. at 32.

When asked if anyone had any objectionable physical contact with her, Gallagher testified that, in the second month she worked at CHR, Liehr put his chair in the aisle to block her way. *See generally Gallagher Dep.* at 107-111. Although he moved his chair when she asked him, she apparently walked into him inadvertently when she passed by. *Id*. Gallagher

described this as primarily a hostile encounter, but believed that it had sexual connotations since it involved unwanted contact; still, she never reported the incident to anyone. *Id*. Gallagher also testified that, on two or three occasions, Starosto would put his legs in the aisle when he would see her get up from her seat to go to the printer. *Id*. When she asked him to move his legs, he would do so after waiting a moment. *Id*. She believed that this behavior was both "sexual and hostile" but does not recall reporting the incidents to Quast. *Id*.

CHR has policies prohibiting discrimination and harassment on the basis of gender, and prohibiting the electronic dissemination of sexually explicit materials through e-mail or the Internet. Gallagher received copies of these policies on her first day of work. *Motion, Exs. C, F*. The sexual harassment policy requires employees to report complaints of sexual harassment to the legal department, the branch resources manager, or the branch manager. It provides names and phone numbers for the legal department and the branch resources manager.[2] Although Gallagher signed an acknowledgment stating that she read the policy and agreed to comply with its terms, she testified at deposition that she did not recall reading it before signing it, that she did not keep a copy of it and that she could not recall asking anyone for a copy.[3] *Gallagher Dep*. at 106-07. The sexual harassment and e-mail and Internet policies are also

---

[2]CHR's Policy Against Sexual Harassment describes examples of sexual harassment, including "[u]se of any offensive or demeaning terms which have a sexual connotation," and directs "[a]ny employee who feels that he or she is being subjected to sexual harassment in any form, . . . , [to] contact Owen Gleason at [phone number] or Tom Sandstrom at [phone number] in the Legal Department, or Colleen Zwach, Branch Resource Manager at [phone number], or your branch manager." *Id., Ex. C*. The policy concludes by stating that "[n]o retaliation of any kind will occur because you have reported an incident or a suspected sexual harassment. We encourage you to help us keep C.H. Robinson Company free of harassment." *Id*. (emphasis in original).

[3]She signed the policy "Julie Chouinard," presumably her maiden name.

.

available on the company's internal website, along with an anonymous third-party toll-free hotline and an anonymous e-mail service for reporting incidents of discrimination or inappropriate behavior. *Motion, Aff. of Jarrod Englebretson* ¶¶ 4-5.

Additionally, CHR employees are required to sign certificates stating that they have complied with CHR's policies during the preceding year – and that if they have any questions about those policies, to contact the Compliance Officer before signing the certificate. Although Gallagher testifies that the sexually offensive conduct occurred from the beginning of her employment, she signed a compliance certificate on November 25, 2002, but never contacted the Compliance Officer regarding offensive conduct. *Motion, Exs. J, K.*

Rather, Gallagher testified that she complained frequently to Quast about the unprofessional and sexually offensive workplace conduct to little or no avail. Although Quast had his own office, he seldom used it; and he usually required Gallagher to voice her complaints to him at his work station. *Gallagher Dep*. at 40-41. Often, he would simply yell at the offending employee to stop the conduct because it was bothering Gallagher which, she says, subjected her only to more ridicule. *Id*. Although Gallagher was aware of the anonymous 800 tip line, she refused to use it because some co-workers and Quast referred to the number as "the waw-waw line" and one co-worker told her not to call the line because the last person who did, lost her job. *Id*. at 194-199.

In early December 2002, three months after Gallagher commenced her employment at CHR, the Vice President of Con-Way (Don Fegtley) called Gallagher at her home to inquire whether she was happy at CHR and to inform her that Con-Way might be moving forward with an outside sales position in Cleveland. *See generally Gallagher Dep*. at

65-76. Shortly thereafter, Fegtley called Gallagher back and confirmed an opening, she confirmed her interest in it and, in a letter dated December 13, 2002, Con-Way formally offered her the position contingent upon submission of an application and a background check. *Id*.; *see also Deft's Ex. B.*

Gallagher claims, however, that she only decided to quit her job at CHR on January 3, 2003. *See generally Gallagher Dep.* at 61-65. This was the day of the National Championship football game between Ohio State University and the Miami Hurricanes. *Id.* She testified that a female co-worker brought Jello shots into the office that day and that, in the early afternoon, many co-workers stopped working and started drinking. *Id.* When Gallagher left, she discovered that she had a flat tire, went back into the office and asked for help changing it. *Id.* Several drunk male co-workers laughed at her and when they left the building, they got into their trucks and "flipped her off" when passing her by. *Id.* However, a male and female co-worker eventually assisted her. *Id.* Although Gallagher claims this incident is the one that motivated her to quit her job at CHR, she did not actually quit until January 8, 2003 and began working for her previous employer, Con-Way, on January 13, 2003.

On October 10, 2006, Gallagher filed the instant complaint alleging claims against CHR for providing a sexually hostile work environment under Title VII (Count I) and under Ohio Revised Code § 4112.99 (Count III), for failing to provide a safe work environment free from sexual harassment under *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486 (1991) (Count IV), and for failing to allow her to compete for, and promote her to, a better position within the company (Count II).

Upon completion of discovery, CHR filed the pending motion for summary judgment. *ECF No. 25*. The Court has reviewed the motion, as well as the opposition brief, *ECF No. 28*, the reply brief, *ECF No. 33*, and the supporting evidence, and is prepared to issue its ruling.

**II.**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts and inferences drawn therefrom must be viewed in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co*., 115 F.3d 400, 403 (6th Cir. 1997). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving that no genuine issue of fact exists and that the moving party is entitled to judgment as a matter of law. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir.2001) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989)). To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir.1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d at 1477).

If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury. *Cox*, 53 F.3d at 148. A scintilla of evidence in support of the nonmoving party's position is not enough. *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir.1995) (citing *Anderson*, 477 U.S. at 252). There must be evidence from which a reasonable jury could find for the nonmoving party. *Id.* If the evidence is insufficient to reasonably support a verdict in favor of the nonmoving party, the motion for summary judgment must be granted. *Cox*, 53 F.3d at 150.

**III.**

**A. Sexually Hostile Environment Claims (Counts I and III)**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a violation of Title VII by demonstrating that discrimination based on sex created a hostile or abusive working environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999). To establish a sexually hostile environment claim, a plaintiff must provide sufficient evidence to show that (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) there is a basis for employer liability. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). The Ohio Supreme Court has held that

violations of Ohio Revised Code § 4112, including claims of a sexually hostile workplace environment, are governed by the same standards as actions under Title VII. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 175 (2000); *Greenwood v. Delphi Auto. Sys*., 103 Fed. Appx. 609, 612 n.1 (6th Cir. 2004).[4]

A hostile environment exists when the workplace is so "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Conley v. City of Findlay*, No. 06-4664, 2008 WL 227331, at *7 (6th Cir. Jan. 28, 2008) (*quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The conduct must be so severe or pervasive that it constitutes a hostile working environment both to the actual plaintiff and to a reasonable person. *Id*. (*citing Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006) (sexual harassment must meet both an "objective" and "subjective" test)). Courts must consider the totality of the circumstances when deciding whether the alleged conduct is sufficiently severe or pervasive to establish a hostile work environment. *Conley*, 2008 WL 227331, at *7 (*citing Harris*, 510 U.S. at 23; *Williams*, 187 F.3d at 562). It is important to note, however, that "Title VII was not meant to create a 'general civility code.'" *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (*quoting Farragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

---

[4]Ohio does not require that a plaintiff prove that he or she is a member of a protected class. With respect to Title VII's fifth element, Ohio requires a plaintiff to prove that either (a) the harassment was committed by a supervisor or (b) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hampel*, 89 Ohio St.3d at 175.

Although Gallagher is a member of the protected class, she has several problems with her *prima facie* case. The evidence shows that the atmosphere in the Cleveland office was pressure filled and fast paced, and mostly male co-workers often used gender-derogatory language when conducting business, talking to each other and referring to third persons. There is also evidence that male and female employees viewed pornographic materials on their computers, that male employees viewed pornographic magazines at work, that a few co-workers exchanged sexually oriented e-mails during Gallagher's tenure (although no co-workers sent such e-mails to Gallagher, and Gallagher herself received a sexually oriented e-mail from a former co-worker at Con-Way), and that there were some instances where two or three male employees shared pictures of nude women with each other and discussed their sexual fantasies and affairs within earshot of Gallagher.

It is the Court's opinion, based on Gallagher's testimony, that the aforementioned conduct created a working environment at the Cleveland office of CHR that was unprofessional and inexcusable. However, to establish the third prong of her *prima facie* case, Gallagher must show that this conduct was based on her sex, i.e., that the conduct occurred because she is a woman. *Williams*, 187 F.3d at 656. The evidence shows that the conduct occurred in an open forum setting where men and women worked together. There is no evidence that anyone tried to discuss sexual topics with her or engage her in their discussions, sent her sexually explicit e-mails or asked her to look at sexually explicit photographs. Aside from the few incidents of offensive conduct directed at Gallagher (the towel incident, the comment that she met the girl quota and the fat quota, and the reference to her by a male co-worker as a cow with milking udders), most of the alleged conduct occurred in an open forum in the presence of both men and

women. "It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007).

Also, although Gallagher has presented sufficient evidence creating a genuine issue of fact as to whether the alleged workplace conduct was subjectively severe or pervasive to her, she cannot show that it was sufficiently objectively severe or pervasive to withstand a motion for summary judgment under Sixth Circuit case law. The cases she cites to support her position are factually distinguishable. For instance, in *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 508-09 (6th Cir. 2001), the Court found that the plaintiff made a *prima facie* showing of a hostile environment where a male supervisor grabbed a male employee's genitals on two separate occasions and stalked the employee several times a day, and the plaintiff's co-workers taunted him for making a harassment complaint. Here, the alleged conduct about which Gallagher complains involved principally her co-workers, only a few incidents of offensive conduct were directed towards her, and the conduct did not involve any inappropriate touching.

Gallagher's reliance on *Abieta v. TransAmerica v. Mailings, Inc.*, is also misplaced. In *Abieta*, the plaintiff's male supervisor engaged her on a daily basis in discussions regarding various females, which discussions were sexually based and offensive. For instance, he made numerous sexual comments about a model found in a Frederick's of Hollywood catalog which he pointed out to the plaintiff. 159 F.3d at 249 (commenting how the model had a terrific sexy body, how she looked "hot," how he would like her slippers under his bed and how he would like to "warm her oven," how he was too old for her and how someone like her would not want him). He also frequently engaged the plaintiff in similar discussions about other models he

wanted to use in his company's catalogs, as well as continually evaluating the bodies of the plaintiff's female co-workers to plaintiff while making no comments at all about the male co-workers. *Id*. These facts are distinguishable from the facts of the instant case, which involved only a few incidents of sexually offensive conduct directed toward Gallagher by her co-workers, and no attempt was otherwise made to include her in sexually offensive discussions.

Given the totality of circumstances (i.e., the frequent use of crude language, the occasional instances of offensive e-mails and pornographic material to which Gallagher was not intentionally exposed, and the few instances of offensive conduct directed at Gallagher), the Court concludes that Gallagher has failed to present sufficient evidence of an objectively severe or pervasive sexually hostile environment.

Even if Gallagher could show that the alleged conduct was sufficiently objectively severe or pervasive to survive summary judgment, her claims would still fail because she has failed to present any evidence that the harassment unreasonably interfered with her work performance. *Hafford*, 183 F.3d at 512 (the fourth element of the *prima facie* case). Gallagher testified that her work performance during her brief tenure was average to above average, that she met her daily and weekly zone quotas, that no one in her zone complained that she wasn't pulling her weight and that she was never counseled about poor performance. *Gallagher Dep*. at 102-03. Indeed, Gallagher sought promotion to zone leader after only two or three months working at CHR. The lack of evidence on this element alone is fatal to Gallagher's case.

Finally, Gallagher has failed to present sufficient evidence of employer liability. *Hafford*, 183 F.3d 512 (the fifth element of the *prima facie* case). The evidence shows that, despite the many avenues CHR provided to Gallagher to voice her complaints of sexually

offensive conduct, and the accessibility of that information to her, she failed to avail herself of all avenues except one, i.e., complaining to Greg Quast. However, it was Gallagher's opinion that Quast could not "handle" the Cleveland office so, rather than avail herself of the majority of CHR's internal complaint system, she chose, instead, to deal with the problem by leaving the company for another, higher-paying job with her previous employer. *Id*. The evidence shows Gallagher only voiced her complaints to upper management after she resigned, when the person who recruited Gallagher for CHR initiated that contact himself.[5]

In conclusion, Gallagher has provided sufficient evidence to present a genuine issue of material fact on the question of whether the conduct at CHR was so severe or pervasive that it constituted a hostile working environment to her. However, under the relatively high threshold established in the Sixth Circuit, Gallagher has failed to provide sufficient evidence showing that the same conduct was objectively severe or pervasive. Even if she could, she has presented no evidence that the conduct had any affect on her work performance. Assuming there was evidence that the conduct unreasonably interfered with her work performance, she has also failed to show employer liability.

---

[5]To the extent that Gallagher claims that she was sexually harassed by Quast, that claim fails for several reasons. First, there is almost no evidence that Quast sexually harassed Gallagher. Even if there was such evidence, the Court finds that Gallagher could not show that CHR is vicariously liable for Quast's sexual harassment of her. It is undisputed that Gallagher failed to avail herself of any the names and phone numbers of persons in corporate headquarters, the anonymous tip line and the anonymous e-mail address which had actually been provided to her to voice her complaints of sexual harassment, all of which she certified that she read, and to which she had ready access through CHR's website. *Deters v. Rock-Tenn Co., Inc*., 245 Fed. Appx. 516 (6th Cir. 2007) (*citing Farragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

**B. *Kerans* Claim (Count IV)**

"The Ohio Supreme Court recognized the common law tort of sexual harassment in *Kerans v. Porter Paint Co.*, 61 Ohio St.3d 486 (1991), without clearly defining the elements of the cause of action." *Minnich v. Cooper Farms, Inc.*, 39 Fed. Appx. 289, 295 (6th Cir. 2002). In cases following *Kerans*, Ohio courts have held a *Kerans* claim requires proof of the same elements necessary to establish a statutory claim for hostile work environment sexual harassment under Chapter 4112 of the Ohio Revised Code. *Id*. (*citing Bell v. Cuyahoga Cmty. Coll.*, 129 Ohio App.3d 461 (1998)). Because Gallagher is unable to establish a *prima facie* case of sexual harassment under O.R.C. § 4112.99, she cannot establish a *Kerans* claim.[6]

**C. Gender Discrimination Claim Based Upon Failure to Be Promoted (Count II)**

Gallagher alleges that CHR discriminated against her based on her gender by failing to allow her an equal opportunity to apply or compete for the position of zone leader. To establish a *prima facie* case of failure to promote under Title VII, Gallagher must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly situated, non-protected employees. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

CHR contends that, although Gallagher is a member of a protected class, she cannot show that she suffered an adverse employment action because the zone leader assignment

---

[6]Additionally, courts in the Northern District of Ohio have refused to extend *Kerans* liability to any set of facts not approaching the facts in *Kerans*, which involved the criminal sexual assault of a plaintiff by her male co-worker. *See, e.g.*, *Griswold v. Fresenius USA, Inc.*, 964 F.Supp. 1166, 1173 (N.D. Ohio 1997); *Alemany v. Riser Foods Co.*, No. 1:04CV501, 2006 WL 475197, at *5 (N.D. Ohio Feb. 23, 2006). Because no such conduct occurred here, Gallagher cannot establish a *Kerans* claim in any event.

was not a posted position and was filled at the discretion of the branch manager. *Gallagher Dep*. at 238; *Quast Dep*. 113.

CHR further contends that Gallagher cannot show that she was qualified for the position. In addition to the tasks of a zone leader, there were three criteria essential to becoming a zone leader – one of which is tenure. Gallagher inquired about the position within a few months of commencing employment at CHR – far short of the time it took other employees to become zone leaders in the Cleveland office (Nicole Gerst had worked at CHR eight years before becoming a zone leader; Derryberry worked at least two years at CHR before becoming a zone leader; Starosto worked four years at CHR before becoming a zone leader).

Finally, CHR contends that Gallagher cannot show that she was treated differently than similarly situated male employees because the position was filled, after Gallagher resigned, by a female (Angela Sarris, who had been with CHR more than two years).

Gallagher has not responded to these contentions in her opposition brief. The Court may take Gallagher's silence as a concession to CHR's arguments which are, in any event, reasonable. Accordingly, judgment is granted in CHR's favor with respect to Gallagher's promotion-related gender discrimination claim.

### D. Punitive Damages

Because the claims upon which Gallagher seeks punitive damages are dismissed, the Court need not address the parties' arguments.

## IV.

For the foregoing reasons, Defendant's Motion for Summary Judgment (**ECF No. 25**) is hereby **GRANTED** and judgment is entered in favor of CHR on all claims.

**IT IS SO ORDERED.**

***/s/Dan Aaron Polster February 19, 2008***
**Dan Aaron Polster**
**United States District Judge**